UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

FILED

MAR 2 0 2020

MICHAEL GANS
CLERK OF COURT

TONYA JOHNSON HYLES,
        Petitioner,

v.

Case No. 1:05-cr-00057-~~RH~~ HEA-1

UNITED STATES OF AMERICA,
        Plaintiff.

MOTION TO PROCEED WITH APPLICATION
TO FILE SECOND OR SUCCESSIVE §2255 TO VACATE

NOW COMES, Petitioner, Tonya Johnson Hyles, pro se, humbly and respectfully requests this Honorable Court to grant leave to file a successive §2255 along with granting of post conviction relief from judgment in which she was charged under 18 U.S.C. §924(c). In light of the Supreme Court's decision in United States v. Davis, 139 S.Ct. 2319(2019). The Supreme Court recently held that the §924(c) residual clause is unconstitutionally vague. Davis v. United States, 588 U.S. __, 139 S. Ct. 2319, 2336(2019). After Davis, it is now an open question whether conspiracy or conviction under 18 U.S.C. §1958 qualifies as "a crime of violence" under section 924(6)(3)(A), the 'elements clause', as the government stated that Hyles was convicted under. Thus, reasonable jurists could debate whether the district court correctly denied Ms. Hyles' relief before. Before this Court and under new rule of Constitutional law from United States v. Davis. Then the Eleventh Circuit held in Hammond v. United States; and now in United States v. Bowen, 17-1011, the Tenth Circuit joins the eleventh, also in the Eighth Circuit is United States v. McArthur, 2019 U.S. App.LEXIS 23940, No. 17-2300, in those Davis is new rule of Constitutional interpretation is retroactive on collateral review.

RECEIVED

MAR 1 9 2020

U.S. COURT OF APPEALS
EIGHTH CIRCUIT

Background of the Case

Tonya Johnson Hyles was charged with 18 U.S.C. 1958(a) conspiracy to use interstate facilities to commit murder for hire in violation of §1958(a), aiding and abetting murder for hire in violation of 18 U.S.C.§2 and 1958, possessing a firearm in furtherance of a crime of violence in violation of 18 U.S.C. §924(c)(1)(A)(i), and conspiracy to deliver a firearm to a felon in violation of 18 U.S.C. 922(g)(1) and 371.  Sentenced to life in prison plus five years and 3 years of supervision release.  The first indictment was only charge with murder for hire on June 14, 2001 and was dismissed on 10/24/2001.  The appeal court stated they have serious concerns as to whether Cannon's statement of the conspiracy to murder Smith in exchange for the Pontiac, we need not address this issue.

ARGUMENT

The government states that Hyles' 18 U.S.C. §1958(a) conviction qualifies as "crime of violence" under section 924(C)(3)(A), the 'elements clause'.  Though 16(b) was deemed as unconstitutional vague, the Seventh Circuit found troubling that under Johnson and Vivas-Ceja there was no offer of guidance to the courts "to determine when the risk involved in the ordinary case of a crime, qualifies as 'substantial'", yet it is therefore unconstitutionally vague and therefore void. Vivas-Ceja, 808 F.3d at 722.

Since then, new Supreme Court rulings and case law have prevailed such as Davis in the wake of Johnson, Simms, and Dimaya.  Since Johnson and Cardena, the Courts inquiry with regard to 924(c) has been limited to the element clause in 924(c)(3)(A). Standardize 'categorical approach'  to the predicate offense has been taken to determine whether the offense(s) charged are a "crime of violence", which can be properly implemented in charging 924(c).  The Davis majority, Dissent and Government attorneys all agreed that the "categorical approach must be used to assess the element clause".

Only statutes that have as an element the use, attempted use, or threatened use of "violent force" or force capable of causing physical pain or

injury to another person will qualify as crime of violence under 924(c)(3)(A)'s 'elements clause' per Johnson 599 U.S. at 134. Regardless of violent murder-for-hire under U.S.C. §1958 , it cannot fit within the "force clause and is not a crime of violence.

Before Johnson, conspiracy to commit murder and other such violent sounding offenses were found to fit within the definition of violent felony "or" crime of violence only under the residual clause. United States v. Lee, 631 F.3d 1343 (11th Cir. 2011) and only if it required an overt act. United States v. White, 571 F. 3d, (4th Cir. 2011).

Just as in the Hobbs Act Robbery, which may be committed using conduct that induces a perceived threat of future injury, clearly the 1958(a) offense, is the same type of "highly attempted threat which falls short of the "violent force" standard dictated in Johnson(2015), and also does not meet the 'element clause', to qualify as a "crime of violence". And as we learn from Dimaya 138 S.Ct. at 1221, such drastic temporal expansion to include conduct that MAY result in damage or injury at some future point in time runs counter to the Courtds' guidance stating that in the ordinary case, the riskiness of a crime arises from the events occurring during the commission not events occurring LATER.

As for the Petitioner, no violent crime exists to warrant the charge in the context of 924(c). Throughout the federal circuits, numerous cases can validate that the Petitioner's charge of 18 U.S.C. §1958 does not constitute as a crime of violence within the 'elements clause'.

The Courts identify the minimal criminal conduct necessary for conviction under that particular statute. Many courts of appeals cases with the 1958(a) offense throughout the circuits demonstrate routinely that NO violence is necessary to accomplish the offense. Indeed, as here, the crime is often committed by the most mundance acts, such as speaking on the telephone or words spoken out of anger can be spoken recklessly. What the federal murder-for-hire statute requires the government to prove, DOES NOT require the use or attempted use of force for violence.

Since Davis several cases are being reviewed and/or remanded including some that present serious question as to statues/offenses that use to be deemed as a "crime of violence" as in U.S. v. Jenkins, 849 F.3d 390, 393(7th Cir.) which has prevailed utilizing Davis. Davis which is now held by the 11th Circuit as a substantive rule of constitutional law and applies retroactively to cases that became final before the rule was announced. On June 24, 2019, the Supreme Court in Davis extended its holdings in Johnson and Dimaya to §924(c) and held that §924(c)(3)(B)'s residual clause, like the residual clauses in the Armed Career Criminal Act and 18 U.S.C. 16(b), is unconstitutionally vague. Davis, 139 S. Ct. at 2324-25,2336. The Court resolved a circuit split on the issue, rejecting the position that §924(c)(3)(B)'s residual clause could remain constitutional if read to encompass a case-specific, conduct-based approach, rather than a categorical approach. Id. at 2325 & n.2, 2332-33. The Court in Davis emphasized that there was no "material difference" between the language or scope of §924(c)(3)(B) and the residual clauses struck down in Johnson and Dimaya, and, therefore, concluded that §924(c)(3)(B) was unconstitutional for the same reasons. Id. at 2326. It also altered the range of conduct and the class of persons that the §924(c) statute can punish. Moreover, courts are looking at statutes that define an offense in a way that allows for both violence and non-violent means of commission and had determined that the offense is NOT categorically a "crime of violence" under the 'force clause' Statutory elements of the offense does not require the use, attempted use or threatened use of any force, United States v. Walker, No. 15-4301.

The courts have found plain error in §924(c) correction in RICO cases United States v. Jones, No. 18-30256(5th Cir. 2019); United States v. Matthew, No. 16-2273 (3rd Cir. 2010). No elements clause found in the 9th Circuit cases that held that 2nd degree murder (18 U.S.C. 1111 and 1153) is not a crime of violence that can support on 18 U.S.C. §924(c) convictions because it can committed recklessly. Begay v. United States, 2019 U.S. App. LEXIS 25196 (9th Cir. 2019). In Jenkins where as a gun was discharged in connection to kidnapping and determined a ransom, the

Seventh Circuit decided it does not categorically justify the 'elements clause'
following Dimaya. Not meeting the 'element clause' and a clause of the §924(c)
was also decided in the kidnapping and ransom and discharge of a firearm case of
United States v. Brazier (7th Cir. 2019). No. 16-4258, 17-1412, 17-2268 and
17-2269, 2019 WL 3774126.

   If it can be found that kidnapping and holding constitutes "no force
or threat of violence" then how is there any possible element of violence found
in Petitioner's or Defendant's case? Hyles was not the shooter nor was she
presented during this crime. The government failed to prove that Hyles had the
gun in her possession at the time of the murder. Quite contrary in fact the trial
testimonies proved the shooter Mr. Cannon went on his own, went to the owner
of the gun Mr. Anderson, and received the loaded weapon from him personally. See
**page 199 lines 1-15**, this case was never about Ms. Hyles, but about Tyrese Hyles
and Cannon. See pages 227,        Testimony differs once more, Carter stated
he had to take him to get gun from under steps. This was in a parking lot, Hyles
was no where around nor in that area. See page 228 CCannon  goes to him and wants
gun and the same  gun that Carter had given back was then given to Cannon (lines
1-9). Once more displayed that Hyles has zero play in this deal. These men have
entered into their own conspiracy and the murderer gets less time

   The Petitioner's mandatory sentence imposed under §924(c) must be vacated,
it does not categorically constitute a crime of violence under the elements clause
§924(c)(3)(A) and under the Supreme Court's decision in United States v. Davis, the
crime likewise cannot constitute a crime of violence under the residual clause.
Davis affirmed,

   1)that the categorical approach  to judging whether a prior commission was
a crime of violence is the appropriate standard, not looking at the defendant's
conduct; 2) effectively ruled that conspiracies to commit crimes of violence(as
well as solicitations quite possibly attempts and accessories charges) are not

crime of violence and 3) ruled that the 924(c) residual clause like the ACCA and

16(b) residual clauses was unconstitutionally vague. The Eleventh Circuit held

that Davis met all of the requirement of retroactivity, because it is a new substantive

rule. In In re Hammoud, the court recently resolved several preliminary issues

with respect to successive applications involving proposed Davis claims. No. 19-

12458, 2019 U.S.App.LEXIS 21950, *12-13, manuscrip op. (11th Cir. July 23, 2019).

First, the Eleventh Circuit court held that Davis, like Johnson, announced a new

rule of constitutional law within the meaning of §2255(h)(2), as the rule announced

in Davis was both "substantive"—in that it "restricted for the first (2019 U.S.

LEXIS 6) time the class of person §924(c) could punish and, thus, the government's

ability to impose punishments on defendants under that statute"—and was "new"— in

that it extended Johnson and Dimaya to a new statutory context and that its result

was not necessarily "dictated by precedent." 2019 U.S.App.LEXIS 21950 at *8.

Second, the court held that, even though the Supreme Court in Davis did not express-

ly discuss retroactivity, the retroactivity of Davis's rule was "necessarily

dictated" by the holdings of multiple cases, namely, the Court's holding in

Welch v. United States, 136 S.Ct. 1257, 1264-65, 1268, 194 L.Ed. 2d 387 (2016),

that Johnson's substantially identical constitutional rule applied retroactively to

cases on collateral review. 2019 U.S.App.LEXIS 21950 at *9(quoting Tyler v. Cain,

533 U.S. 656, 662-64, 666, 121 S.Ct. 2478, 150 L.Ed. 2d 632(2001)). Additionally,

we also clarified that In re Baptiste, 828 F.3d 1337, 1339-40(11th Cir. 2016)

(holding that, under 28 U.S.C. 2244(b)(1), a federal prisoner's claim raised in a

prior successive application shall be dismissed), does not bar new Davis claims,

as Davis was a new constitutional rule "in its own right, separate and apart from

(albeit primarily based on) Johnson and Dimaya." 2019 U.S.App.LEXIS 21950 at *12.

    The rule announced in Davis is "new" because it extended Johnson and

Dimaya to a new statute and context as stated above. In addition, the court in

Davis, in their closing remarks, choose to highlight that both defendants are (now)

entitled to full resentencing. In a new case Lisa Mack v. United States, civil

right action no. 4:19-cv-309-Y.  Another murder-for-hire case where Mack and her
co-defendant(released a couple years prior to Mack) have both been released for
the very same charges.  Even in United States v. Ledbetter, et (Nos. 13289/3290/
3299/3302/3304/3306/3308/3309)(6th Cir. July 3, 2019) the defendant participation
in a home invasion led to their conviction of murder by firearm during a crime of
violence, in which the appallate court relied only on in light of Davis.  United
States v. Davis, 139 S.Ct. 2319(2019).  In summary this in essence should demonstrate
the defendant's right for fundamental fairness under the due process clause.  The
§924(c) charge was deemed illegally used here with this Defendant/Petitioner.  At
the time of conviction, Davis' constitutional claim was "so novel that its legal
basis (was) not reasonable available to counsel."  Therefore, it was not available
to Hyles, but now the constitutional claim is available and the Petitioner seeks
the "vacated" of her sentence and conviction and a new resentencing be granted.

The government relied on "phone calls" to prove their "vision or theory"
of Hyles being involved in a conspiracy.  Looking to the trial transcripts page
183 lines 12-13, states David Carter said...but in earlier testimony on page 151
lines 13-17 says Tonya Hyles said...conflict and changing account by the government.
Page 183, lines 3-6, these conversations could not be recorded.  So where is the
government's proof or what so called evidences those they invented.  How can the
government made out material fact contain in these phone calls where the so-called
conspiracy in fact took place?  One cannot tell what is in another's head and surely
not on unrecorded calls.  Page 194, lines 20-22, if Hyles was apart of some
conspiracy agreement why did she block the calls from the jail?  Page 199 lines 1-4,
this is not Hyles in a conspiracy, this is merely "acquaintance" issues.

Conspiracy charge frequently are to broad and confusing scope, and that
is particularly true of conspiracies under Espionage Act.  See; e.g., Gorin v.
United States, 312 U.S. 19, 85 L.Ed. 488, 61 S.Ct. 429; United States v. Heine
(CCA2d NY) 151 F.2d 813.  Especially misleading to a layman are the overt act
allegations of a conspiracy.  Such charges are often, as in its indictment, mere

statements of past association or conferences with other persons, which activities apparently are entirely harmless standing alone. As they showed picture of past association of Hyles and Cannon , apart and standing alone from the whole situation or occurrence of the case at hand, not related.

In Hyles case this is all there was and the fact Hyles was associated with these men, and simply did as her husband had asked and bonded a "friend" out of jail. There was no evidence of things were spoken on the phone calls. And that fact was spoken at the trial. See page 183 lines 3-6- "conversations could not be recorded. Page 199 lines 1-4, this is Not Hyles' conspiracy and surely she could not being charge just merely because of merely acquaintance. Page 106, 8-11 , Hyles was never involved with any conversations on three way calls with her husband and other as the government implied and there was no proof of that neither. Looking to the words of the judge on page 10, lines 18-22, "that but for her conduct but for her involvement, but for, but for her solicitation of an acquisition and provision of the weapon, but for everything." These statements are beyond shown **not** factual by their own witness per the government. It was proven that Hyles had not touched the weapon and then proven that Carter gave the weapon back to the owner and then proven that Cannon on his very own went to the owner and got the loaded weapon this time and not once did the witnesses nor the government prove or show that Hyles had any involvement at all with these men. The aide and abetting was clearly done by April Leatherwood and is where Cannon went and slept and changed then left from. This party was never charged yet clearly housed him, not Hyles.

Page 10, line 25, the Judge states "Cannon was the shooter". Then on to page 11 line 1, he may have been aided by someone else then onto line 3 of page 11, "although there are no specific really eye witnesses." Anderson, 477 U.S. at 252, 251-252 "Indeed, "credibility determinations the weighing of the evidence, and the drafting of legitimate inferences from the --facts are jury function not those of a judge." at 255.

The government had used Ms. Hyles in the grand jury to testify to gain the

indictment on her own husband, and then proceeded to drop all charges toward Hyles and told her that then she was free for five years, until they wanted her to fly down and testify. When she did come down to them, they changed what they wanted her to say in court under penalty of perjury something untrue, basically advised her to make false statements and threatened her, then sent her back home then re-indicted her. This horrendous misconducts by the government, and malice granted the course for prosecutorial misconduct, which caused Hyles to ineffectively to defense herself to fight for her liberty and life against a system set up to break even the strongest. Her then attorney did not do any investigations nor interviewed any witnesses for Hyles' benefits despite Hyles' requests and spoke to him about and presented no strategy nor objected to any wrong information or presented any evidences nor witnesses. A reasonable Jurists could conclude that the district court wrongly denied Hyles's claim of ineffective assistance of counsel in relation to the failure to investigate and present evidence of Hyles not involve or not anywhere around in the area where the incident took place or where the gun was acquired by Cannon, or Hyles was never in possession of the gun and her finger print was never present on the weapon nor the government presented any evidences. Defendant was deprived of the effective assistance of counsel at trial, (even before, trial) when counsel failed to present evidence that would have rebutted the prosecution evidence or no evidence but merely their words that she was involved in the conspiracy. They talked about Tyrese Hyles and other defendant's motive but what about Hyles, what was her?. Then he also would not let her testify in her own defense. Whether or not motive is an element, once the government offered that evidence the door on motive was open, making admissible (subject to limiting instructions, perhaps) evidence tending to raise doubts about the inference the prosecution sought to have the jury draw from it. See United States v. Acosta, 475 F.3d 677, 683-84(5th Cir. 2007)(otherwise inadmissible or unduly prejudicial evidence may become admissible through adversary's "opening the door"); United States v. Maldonado, 472 F.3d 388, 397-98 (5th Cir. 2006)(same). Moreover, specific evidence of Cannon' and other

involve(not Ms. **Hyles**) planned and executed of the conspiracy that the government claimed did not hold up the conviction of murder by Cannon, that he was acquitted even identify as a shooter per record.  Then how can the government charged and convicted Hyles of a crime of violence.  The attorney represented Hyles could have used those so-called evidences that Hyles were not be able to view nor was presented by the government, to confront and impeach any false statements by the co-defendant or witnesses for the government by showing their bias in testifying against her and accusing her of committing the murder that Cannon might of planned and executed himself or with other people.  By ignoring the argument suggested in her §2255 as to the counsel's assistance in this regard or anything else was ineffective, and instead ruling on unpersuasive and hypothetical grounds, the district court rendered a decision with which other reasonable jurists could disagree.  Accordingly, the second or successive §2255 should be granted.

Hyles' counsel's performance failed below the standard, rendered ineffective of assistance when failed to form investigations and did no interviews of any witnesses Hyles spoke to him about and presented no defense.  The indictment was very vague that no ordinary person can understand what statute that a defendant would know his offense violated.  United States v. King-Gore, 2017 BL 423851, D.C. Cir., No. 13-3010, 11/28/17.  Breach and prosecutor's misstatement and conduct. His statements caused the Defendant in that case to have more prison time than he would of has.  This action call for new sentencing by new judge is necessary to maintain "fairness and judicial integrity."

Looking at due process rights and "Fourth Amendment" whether the purpose or flagrancy of the misconduct was "calculated" to produce the evidence.  Clearly this misconduct in this instance case obviously shown flagrant, they let Hyles goes without any charges for five long years because they knew she did not involve in the conspiracy and there was no evidence to prove otherwise.  When asked by the prosecutor to come down she did and then when she was asked to state false statement in court as they instructed her to orchestrated and threats by the agents and prosecutor,

10

after five years without any charges and they told her previously 5 years prior
they were proceeded to drop all the charges they intended to charge her and she
did not do anything wrong, was not having any trouble with the laws, during those
five years.  Now  after five years she became guilty because she refused to goes
along with them about the false statements they wanted her to say.  Then they
offered her six years if she plead out and plainly the government wanted her to
plea out.  Her then counsel advised her not to take it because the government has
nothing on her that they knew she was not involved and advised her to take it to
trial.  She did all she could by aided her counsel and provided information for the
attorney to investigate and she also wanted to testify and the counsel supposed to
interview the witnesses and objected the government's theory which was not the true.
But the counsel failed to do so and there was no evidences produce by the prosecutor
that Hyles was in possession of the gun nor she was anywhere near when the gun was
obtained by the shooter (Cannon as the government claimed) from the owner of the gun
himself.  The prosecutor had the indictment so vague that an ordinary person like
Hyles has no chance of understanding it and the counsel failed to object element,
clearly numerous cases can validate that the Petitioner's charge of 18 U.S.C. §1958
does not constitute as a crime of violence within the 'elements clause'.

Because of the gun charge of §924(c) placed her under mandatory minimum
sentence of life in prison which the government failed to prove and no evidence
connected Hyles to the offense.  Violating Hyles Due Process.  Under Rule 52(b)
of the Federal Rules of Criminal Procedure, as a result of plain error include the
requirement that the error seriously had affected the fairness, integrity, or
public reputation of the judicial proceedings.  In Roe v. Flores-Ortega, 528 U.S.
470, 481, 120 S.Ct. 1029, 145 L.Ed.2d 985(2000).  a defendant raising such a claim
can demonstrate prejudice by showing "a reasonable probability that but for counsels
unprofessional errors, the result of the proceedings would have been deifferent."
Id., at 482, 120 S.Ct. 1029, 145 L.Ed.2d 985.  Clearly this has happened here in this
instance case.  Not only by Ms. Hyles' own counsel but by the government's counsel

as well.

In regards to Fairness see; United States v. Olano(1993) 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d. 508,,1993 U.S. LEXIS 2986; Johnson v..United States(1997) 520 U.S. 461, 117 S.Ct. 1544,137 L.Ed. 2d 370, 1999 U.S. LEXIS 4201; REH.Den. 527 U.S. 1058, 120 S.Ct. 22, 144 L.Ed.2d.826, 1999 U.S. LEXIS 4645; United States v. Vonn(2002) 535 U.S. 55, 122 S.Ct. 1043, 152 L.Ed.2d 90, 2002 U.S. LEXIS 1337; United States v. Cotton (2002) 535 U.S. 625, 122 S.Ct. 1781, 152 L.Ed.2d. 860, 2002 U.S. LEXIS 3565; Khanh Phuong v. United States S.Ct. 2130, 156 L.Ed.2d, 64, 2003 U.S. LEXIS 4425.

Cannon's testimony cleared Hyles (See United States v. Cannon,475 F.3d 1013(8th) as he admitted he went on his own to get a gun and he not once told Hyles of his actions and when he asked for a ride he never said that he and Hyles engaged in any discussion or talked about his plan to kill Mr. Coy Smith.  The government falsely stated on page 7 line 21-22.  That"the evidence proved that the defendant then helped plan the murder of Coy Smith."

The question a reasonable jurist would ask is why after five years and the intended charges dropped, did the government then after five years feel Hyles was so guilty as to get a life sentence impose on her?  Someone is guilty or not and the the government did not get what their way when advised her to state false statement as they instructed and therefore sought out the charges once more to attempt to intimidated and bully Hyles with threats to involve with their plan but she reacted by proceeded to trial.  See page 8 lines 17-18, "but in all candor, she was given every opportunity to change that course." See (sentencing transcripts).  Page 9 line 22, Mr. Price states "defense counsel overlooks law of conspiracy."

Mere passive cognizance of the crime or some unlawful act to be committed or mere negative acquaintance is not sufficiently to make one guilty of conspiracy 11 AM Jur 544, conspiracy C.F. Smith v. O'Grady, 312 U.S. 329, 85 L.Ed. 859, 61 S.Ct. 572. In United States v. Gomez, 92 F.3d 770(9th Cir. 1996) Justification Justification defense is available under statute that prohibits being a felon in

possession of a firearm (Authors note: this case is so bad that chief Appellate Judge Kozinski bluntly states, "This case gives fresh meaning to the phrase 'I am from the government and I'm here to help you.").

U.S. v. Lopez, 100 F.3d 98(9th Cir. 1996) Bailey v. United States, 516 U.S. 137, 133 L.Ed.2d 472, 116 S.Ct. 501(1995).

Conviction of the use of firearm, for purposes of mandatory sentence provision of 18 U.S.C.S. §924(c)(1), held to require showing of ACTIVE employment of firearm. United States v. Quintanilla, 218 F.3d 674 (7th Cir. 20  ) To secure a conviction for a felon in possession of firearm, government must prove beyond a reasonable doubt that: 1) defendant had a previous felony conviction; 2)defendant was in possession of firearm; and 3)firearm had traveled in or affected interstate commerce. Ms. Hyles was not in possession of a firearm. United States v. Diaz, 248 F.3d 1065(11th Cir. 2001) conviction for using a firearm in furtherance of a crime of violence requires proof of active employment of a weapon, and proof of mere possion was insufficient. United States v. Munoz, 143 F.3d 632 (2nd Cir. 1998) Supreme Court's BAILEY decision, which defined "use" for purpose of statute prohibiting use or carrying of firearm during drug transaction could applied retroactively on defendant's motion to vacate sentence. United States v. Woods, 778 Fed.Appx. 483(2019) Ninth Cir. The court considered whether the error was harmless beyond a reasonable doubt. The court recounted that no witness identified Woods as the robber or placed him at the robbery. Since the rest of the evidence was circumstantial it does not appear that "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." **The** court reversed and remanded for a new trial.

In Hyles' case, Hyles was denied by the district court due process by "considering unreliable information that demonstrably made the basis for the sentence." United States v. Hackins, 53 F.3d 276, 279 (9th Cir. 1995). United States v. Mezas de Jesus, 217 F.3d 638, 642(9th Cir. 2000); United States v.

13

Medina, No. 18-10282 (9th Cir. Dec. 17, 2019).

Under 18 U.S.C. §924(c) number (3) For purposes of this subsection the term "crime of violence" means an offense that is a felony and (A) has an element the use, attempted use, or threatened use of physical force against the person or property of another, **or** (B) that by its nature, involves a substantial risk that physical force against the person or property of another maybe used in the course of committing the offense.

Clearly by not only the trial testimonies, but also by the closing arguments of the government and former counsel, along with the judge's own statement that Hyles was not the killer. And all witness' statements show Hyles to not have the weapon, in fact the shooter Cannon admitted to going alone to get a loaded weapon and then went hiding out at someone else's house. Hyles cannot carry a crime of violence nor involve in it. The sentence is unconstitutional and must be vacated. Looking at United States v. Hawkins, No. 17-11560 (11th Cir. 8/20/19). (DEA agent's testimony was improper by summarizing evidence, interpreting plain language, and drawing inferences that the jury needed to make, and not on their own. Presentation as dual fact-expert witness exacerbated the issue and admission of testimony was pain error...remanded for new trial).

This not only accord with witnesses, but drawing inferences that the jury needed to make was done often by the government. See United States v. Hamid Hayat, No. 2:05-cr-240-GEB, Docket Entry 752 (Eastern Dist.Cal., July 30, 2019)(unreported) Trial counsel was ineffective by failing to investigate potential alibi defense on mistaken belief that out of country witness testimony could not be used at trial. FRCrP. 15 would have allowed the use of deposition testimoney under the circumstances to directly undercut government's case. (2255 motion granted). Hyles' trial counsel would not call any witnesses to aide in defense to fight against the government hypothetical case therefore deprived her of her due process right. For all the contributions of testimony and the violations of Constitutional rights and in light of Davis being a new rule that Petitioner's or defendant's sentence

should be vacated.

Additionally,  The trial court's application of 18 U.S.C. §924(c)(1)(A)(i)'s
life in prison mandatory minimum enhancement was not supported by any jury finding,
and thus it presumptively violated the Supreme Court's ruling in Alleyne.  Alleyne
was not available at the time of Hyles' trial nor alleged offense.  Alleyne held
that "[f]acts that increase the mandatory minimum sentence are... elements and
must be submitted to the jury and found beyond a reasonable doubt." 133 S.Ct.
at 2158.  Although Petitioner had jury trial, the fact that the recorded conver-
sation between Cannon and his then girlfriend April Leatherwood would impeach
statements Leatherwood had made during her testimony(in Tyrese Hyles' case).  But
the court ruled that there had not been sufficient compliance with the requirements
of Federal Rule of Evidence 613(b) and that the evidence was cumulative, and
excluded the conversations.  The district court would allowed the testimonies or
statements from the so-called co-conspirators to admitted to court where the jury
would hear and drew inferences from as "facts", although Petitioner objected to
those as unreliable because she knew she was not involve in the so-called conspi-
racy.  But the court would not allow facts those might prove Petitioner is
innocenced and her then counsel did not bring that up.

Such as the testimony Anderson stated Hyles said "that's fucked up that
Coy had testified against Tyrese" and "that she's going to get somebody to
take care of his ass."  Echoing the statement Carter testified that Tyrese said
"that it was fucked up, he would have did it for me." Sound like it was from one
person saying.  Like a set up.  Even though Hyles's then attorney failed to object
that Hyles was involved in the conspiracy with Carter, Tyrese and Anderson in
the first conspiracy.  Then Anderson stated that he told Hyles where to placed
the gun in the cabinet.  Then Carter got it from the Cabinet himself.  A reasonable
jurist would debate if Hyles was in the conspiracy and Carter was in her residence
and she was the one initiated to borrow the gun from Anderson.  Then why Anderson
instructed her where to put the gun.  It could of been Tyrese told Anderson where

place the gun in Hyles' house so Carter can retrieve it. Hyles might knew about it but that did not prove she was involved or took part in it. If she was the one whom in possession of the gun then why should it matter where she placed the gun. When the government or Carter said he was in the house at Hyles' residence then why she just did not handed him the gun directly but placed the gun in the cabinet as Anderson instructed and then Carter went to the cabinet and retrieved the gun himself. Might be she did not know about the conspiracy until later and blocked the phone from jail then did not want to have anything to do with it that was why she did not want the gun in her possession; that was the reason why Carter went to Anderson and returned his gun. There was no fingerprint belong to Hyles on the gun. The counsel was ineffective to not objected to the government's theory of Hyles involved in the conspiracy. That would cast doubt on the whole theory, therefore the government had not prove beyond reasonable doubt of Hyles' alleged offense.

Even if hypothetically say she was involved in the first conspiracy. There was no proof that she was in the conspiracy with Cannon. If she was then the agreeable agreement to pay Cannon of the pontiac then why was Cannon and herself argued about the car and Cannon threaten her per the police officer, whom stated that he testified that he told Cannon to stop threatening Tonya about the vehicle and informed Cannon that the vehicle was marital property. Cannon responded that "Tyrese had told him he could have the vehicle". Cannon did not say they as both Tonya and Tyrese said he could have the car. Maybe Tyrese promised him but never was Tonya. Secondly, how would the officer knows about the vehicle was marital property. That does not prove that Tonya was involved in the conspiracy. That was officer Jones. Then another testimony from Omar Wiley stated that the afternoon before Smith was murdered, while sitting on the porch at Wiley's house, Coy Smith drove by. Wiley testified that when Cannon saw Smith, he told Wiley, "I'm gonna kill that nigger...Nigger got my boy." As Omar Wiley should of did something to prevented that. Another thing is the statement sounded like

Cannon probably plotted to kill Smith himself because Tyrese was his "boy". He would wanted the Pontiac later as he might thought he deserved it. Wiley also testified that after Smith's murder he observed Cannon and Tonya arguing (2007 U.S. App.LEXIS 14) over the Pontiac. Cannon was driving the Pontiac that he threaten Tonya over as the officer stated to told him stop threaten her. She was scared that was might be the reason why he got to drive the car.

There was no evidence introduced that show Tonya knew that Cannon got the weapon from Anderson or carrying it. The phone calls that the government introduced as if it was three ways also was not making sense. In order for Tyrese to talk to Cannon through Hyles's phone at her residence, Hyles has to be the one whom called Cannon. The phone calls cannot join when Cannon was the one whom called Hyles. Not once did she called Cannon. When someone is on the phone and the phone has call waiting it will make a clicking sound as interruption. Why would Tyrese and Hyles conspired with Cannon to kill Smith if Tyrese already set it up with Carter on the exact same day. Hyles also was charged and convicted of 18 U.S.C. §922(g)(1), 371. The fact was cleared that Carter stated he retrieved the weapon from the cabinet himself and left, if that was the truth which Hyles objected, that meant Anderson delivered that weapon to Carter not Hyles, she did not deliver a firearm to a felon. Whether Carter was convicted felon or not he was not sentenced and was being able to get bonded out. He obtaining a firearm himself which was delivered by Anderson that was their statements. Hyles would not know the law about the statute of felon and firearm anyways. Maybe Anderson put it there for Carter himself.

For the reasons explained in Jones, Apprendi, and Ring, the requirements of the Sixth Amendment were clear. The application of Hyles' sentencing scheme violated the defendant's right to have the jury find the existence of "any particular fact"' that the law makes essential to his/her punishment. It is not what the defendant did wrong that the judge can punish him/her but what the offenses were that violated what statute. Here, regardless of the fact what the defendant did,

or did not do.  "That after applying the categorical approach, the predicate offense
that the government might of use conspiracy of murder-for-hire does not qualify
as a 'crime of violence' under the 'force' clause found at §924(c)(3)(A)"
The conviction of Hyles under §924(c) must be set aside because §924(c)(3)(B)'s
residual clause is unconstitutionally vague, Davis renders Hyles's §924(c) conviction
invalid and must vacate the conviction.  Similar to conspiracy to commit Hobbs
Act roberry, as conspiracy to commit murder-for-hire, which suggests that it may
have served as the predicate offense for the §924(c) offense and §922(g)(i),
Section 1958(a) encompasses both murder-for-hire and conspiracy to commit
murder-for-hire, and there is no binding precedent from the Supreme Court at this
time to indicate that conspiracy to commit Hobbs Act Roberry categorically qualifies
as a crime of violence under the elements clause of §924(c)(3)(A) or the conspiracy
to commit murder-for-hire categorically qualifies as a crime of violence under the
elements clause of §924(c)(3)(A).  See 18 U.S.C. §1958(a).  Therefore, because it
is unclear from the record whether the jury found that the predicate offense of
Hyles' §924(c) (and might be §922(g)(1)) conviction was conspiracy to commit
murder-for-hire, she has made a prima facie showing that her Davis claim concerning
her §924(c) conviction and sentence satisfies the statutory criteria of §2255(h)(2)
on the basis that those convictions maybe unconstitutional under Davis, as she
potentially was sentenced under the now-invalid residual clause of §924(c)(3)(B).
See 28 U.S.C. §2255(h)(2); Davis, 139 S.Ct. at 2324-25, 2336.

      One key fact also was that Cannon whom the judge said was the shooter
was "acquitted of the murder charge due to insufficient evidence", the evidences
was unable to charge or convicted him, needless to say that the evidences absolutely
could not of been sufficient to prove Hyles' conspiracy to commit murder-for-hire
as the government leading the jury and the court stated, unfortunately due to the
counsel ineffectively caused Hyles to received the general guilty verfict.  Once
again to answer the question how the police officer Jones knew Cannon was threaten
Tonya Hyles about the vehicle and that it was a marital property because Hyles

reported the complaint that Cannon threaten her to take her car, that is a material fact that should of prove of her innocence of the accused crime of conspiracy to commit murder-for-hire and was not involved.  Not only her trial counsel was ineffective by not objected to the government's theory of her involvement in the conspiracy and the possession of a gun was not objected as Hyles did told him to, but the post-conviction counsel also ineffective by not correctly objected or investigate and stated of the trial counsel ineffectiveness.


CONCLUSION

our justice system is what we hold onto with hope and trust, that no one should be imprisoned that is not guilty of a crime and will not suffer injustice term of imprisonment base on false facts and offense.  Our system sometimes fails and then one would placed into two paths of choices, one is to give up and wait for death on the crime that they did not commit or two, to fight, scream, pound until you are hardened to withstand all blows casted upon you.  That is the path that Hyles choses.  There are many options that this court can move to correct her sentence and she places that trust and hope further into the system that new laws, new cases will open up your line of sight and grant her motion to vacate, set aside and correct her sentence.


Respectfully Submitted,

Tonya Hyles
3/18/2020

CERTIFICATE OF SERVICE

I, Tonya Johnson Hyles, certify that I am sending the true and correct copy of motion to the district court.  And a true and correct copy of the exact motion was placed into an envelop and handed to the prison staff at mail-room via United States mail.  It is deemed filed. Houston v. Lack, 487 U.S. 266, 1988.

Respectfully Submitted,

Tonya Hyles
3/12 /2020

7

1  can say that on behalf of the Government, we do not believe

2  that any of those objections have meritor at least enough

3  merit to change what the Court is required to do in this case.

4  We believe it is the Government's position and the statutory

5  position that there is no room for discretion here by the

6  Court with regard to the convictions bya jury of the

7  defendant's peers.  The major counts of Counts One and Two and

8  Count Three all require mandatory sentences, and in this

9  instance, unfortunately for the defendant, it is a life

10  sentence with regard to Counts One and Two.  The Government's

11  memo presented by Assistant Stevens I think answers all of

12  those issues presented by the defendantas well as admittedly

13  indicating some of the factual changes that the Court is

14  willing to make in terms of the changesnecessary.

15        However, the jury convicted thedefendant of

16  conspiracy to commit murder for hire, and the Government's

17  evidence at trial established-- and I think of course this

18  particular Court listened to that evidence -- that there was a

19  conspiracy to murder Coy Smith for testifying against Hyles,

20  Tyrese Hyles.  The defendant was provenby the evidence to be

21  a co-conspirator.  The evidence proved hat the defendant

22  helped plan the murder of Coy Smith, that the defendant then

23  took steps to carry out that plan by assisting with the gun,

24  the shooter's interstate travel, and thecommunications

25  between both Hyles and Cannon.  The evidence showed that Coy

8

1    Smith was murdered, so, of course, the Government would take

2    offense that as to the actions of defendant that there was no

3    harm to Coy Smith because he has already endured a life

4    sentence of death.   The jury was properly instructed without

5    objections by the defendant, and the verdict directors

6    required the jury to find that the death of Coy Smith resulted

7    from the conspiracy which included the defendant pursuant to

8    the evidence.   Therefore, statutorily, life is a mandatory

9    sentence in this matter.   And with regard to Count Three, the

10   five-year sentence consecutive to the life sentence that the

11   Court is required to give by statute is one that is not likely

12   to prejudice the defendant as argued by the defendant under

13   the circumstances.   Plus, the Eighth Circuit decisions support

14   the idea that a mandatory sentence is the mandatory minimum

15   sentence in situations like this.

16        It is unfortunate that Ms. Tonya Hyles is facing a

17   life sentence, but in all candor, she was given every

18   opportunity to change that course, including a constitutional

19   required jury trial that she did have. Unfortunately, the

20   jury didn't see her presentation of the evidence the way she

21   wanted it to; therefore, she's facing this life sentence.   And

22   although as I said it is unfortunate, I think the Court is

23   required to do exactly what the Congress has mandated.   Under

24   those circumstances, we would encourage the Court to support

25   the sentence that has been presented by the probation and

9

1    parole department in all respects

2         THE COURT:  Anything in response, Mr. Hill?

3         MR. HILL:  Yes, Your Honor.  First of all, I think

4    that Mr. Price is overlooking the real important aspect of the

5    argument.  Is there a question that Coy Smith is dead?  No.

6    The real question is that did the actions of the defendant

7    bring that about.  That is the real question under 1958A.

8    Based on the evidence presented, there - it was very thin as

9    to what involvement my client had in that.  One matter for the

10   record, Your Honor, I would ask that the Court consider

11   treating the objections to the presentence investigation

12   report as set forth in paragraph 1 as a motion for a new

13   trial.  I mean, if we want to be clear about things, that is

14   the issue, and I would ask that the Court treat this as such a

15   motion and allow it to be filed as such in addition to it

16   being as an objection.

17        Finally, Your Honor, we still have the opportunity to

18   do justice here.  This is a court of justice, and for whatever

19   sins my client have, she does not deserve life without parole

20        THE COURT:  Anything further, Mr. Price?

21        MR. PRICE:  Your Honor, the only response I would

22   make is that defense counsel overlooks law of conspiracy and

23   the jury verdict according to the verdict directors.

24        THE COURT:  With regard to your objections that you

25   have filed, Mr. Hill, there have been one concession regarding

10

1    the factual objections, so that is a given.  That is the

2    concession by the Government relative a conversation that was

3    in the presentence investigation report, paragraph 13.  Your

4    other objections, factual objections, that you set out in your

5    objections are either moot or refuted by the record or have

6    been otherwise corrected in the presentace investigation

7    report.  Those things are obvious and clear on their own.

8         On the issue of sentencing and the facts with regard

9    to sentencing as gleaned from the trial, specifically the

10   first paragraph of your objection, which is really the key as

11   you noted because that is the significant time with regard to

12   sentencing, I think that, you know, after having presided over

13   this case and hearing the testimony at trial regarding

14   Ms. Hyles and her involvement in all couts, the jury clearly

15   saw what the evidence was.  They were not confused, they were

16   not misled, and they were not inclined to convict on slim or

17   thin evidence.  It was quite meaty as I recall regarding the

18   involvement of Ms. Hyles, so meaty to the extent that but for

19   her conduct, but for her involvement with the Parisienne, but

20   for her bringing Mr. Cannon back from Memphis, but for her

21   solicitation of an acquisition and provision of the weapon,

22   but for everything of significance that Ms. Hyles did, it is

23   extremely likely that the homicide of the victim could not

24   have occurred.

25        Cannon was the shooter.  He may have been aided by

11

1   someone else at the scene, but I think hat the evidence that

2   was presented demonstrates that the reasonable conclusion,

3   although there are no specific really eyewitnesses, say for

4   the deceased's wife who saw a man who may have fit the

5   description of Cannon in her home after hearing a popping

6   sound and smelling something burning and realizing that that

7   sound was a gunshot to the head of her husband as he lay in

8   bed sleeping next to her and that this smell of something

9   burning sound was the effect of the gunshot and perhaps

10  stippling and powdering against his flesh, her being in fear

11  for her life and hiding within the residence and in some room,

12  in a closet I think it was, being concerned that she, too,

13  literally was going to be taken out that night and testifying

14  at trial regarding what she saw and heard, those things could

15  not have occurred but for the specific onduct and involvement

16  of your client, Ms. Hyles.  That's what was alleged in the

17  indictment, and that's what was proven a trial, and that's

18  what the jury concluded when they returned their verdicts as

19  they did.

20          The thing that is unfortunate is, as Mr. Price said,

21  there was ample opportunity for the defendant to secure less

22  of a sentence, which she opted out of.  That is on her.  It is

23  not on the evidence.  It is not on the decision of the jury.

24  It is not on the fact that the Government brought an

25  indictment against her.  It is not on the testimony of anybody

VOLUME II

106

1    with Tonya?

2    A    No.

3    Q    Okay.  You just talked to Ty?

4    A    Yes, but she was on the phone.  I knew the only way he

5    could call my house was through her

6    Q    I understand that.  But you don't know whether she was

7    listening?

8    A    I don't know if she was on the other end or not, but I

9    just sit up here and told you that's the only way he can call

10   my house, so I'm assuming she had to be holding the phone.

11   You know what I'm saying?

12   Q    If you have a telephone, you get a call in from the jail,

13   you accept the call and you say, Well, I want to make a call

14   over to so and so, you hit a button, you dial the next number,

15   it rings at their end; correct?

16   A    Yes.

17   Q    At that point, whoever is in the middle can throw the

18   phone down; true?

19   A    Yes, sir.

20   Q    Okay.  And there wasn't any interaction between you and

21   Tonya or Tyrese and Tonya that you heard in those telephone

22   calls?

23   A    Right.

24   Q    Okay.  When you arrived at the Central Gardens apartment,

25   Tonya was there?

VOLUME II

151

1  Q    Do you recall that vehicle as the collateral on this

2  bond, Mr. Graue?

3  A    Yes.

4  Q    I'm going to show you now what's been marked as

5  Government's Exhibit 27 and ask if you recognize that?

6  A    Yes, sir.  That is the vehicle.

7  Q    Okay.  That was put up as collateral on this bond?

8  A    Yes.

9  Q    Did you at the time that Ms. Johnson was filling this

10  out, did you have occasion to talk to her at all about filling

11  out this paperwork?

12  A    Yes.

13  Q    Did she tell you anything about the car at that time?

14  A    Just that she had just sold the car to David Carter and

15  that he wanted to put the car up on the bond.

16  Q    Okay.  And so she indicated to you she had just sold that

17  car to David Carter?

18  A    Yes.

19  Q    And that that was going to be the collateral on this

20  bond?

21  A    Yes.

22  Q    I want to show you page 2 of Government's Exhibit 15.

23  This is a Power of Attorney?

24  A    Yes, sir.

25  Q    And does that indicate the owner of the collateral on

VOLUME II

183

1   of 14 minutes?

2   A    Yes.

3   Q    Let me ask you this, Mr. Broaddus  At this time, did

4   this system allow the Pemiscot County Jail to actually record

5   the telephone conversations of the inmates at the Pemiscot

6   County Jail?

7   A    No, it didn't.

8   Q    So this is essentially the record that you have of those

9   phone calls being made?

10  A    Yeah, just the call records

11  Q    Thank you, sir.  Why don't you, if you would, just return

12  to the stand.  Mr. Broaddus, can you tell the jury considering

13  your knowledge of the Evercom system at that time, was it

14  possible for inmates to make a three-way call from the

15  Pemiscot County Jail?

16  A    Well, the system wasn't supposed to allow it, but

17  nothing's 100 percent, so it was possible

18  Q    Okay.  And how is that done?  How is the system

19  circumvented?

20  A    Different ways.  It could notice clicks.

21         MR. HILL:  Judge, I will object.  There is no

22  foundation to prove this man's an expert to testify regarding

23  how the system operated.

24         THE COURT:  Foundation.

25         MR. STEVENS:  Okay.

VOLUME II

194

1    somebody calls from a correctional facility, that your system

2    is going to say you have a collect call from and then it

3    states the name that is stated by the caller.

4    A    Right.

5    Q    An inmate at a correctional facility.

6    A    Yes.

7    Q    To accept the charges, press this number.

8    A    Right.

9    Q    To decline, press this number.

10   A    Yes.

11   Q    Or to block and never receive another call from this

12   number, press that.

13   A    Not from this system.

14   Q    That wasn't the way it was set up?

15   A    No.   This system here, you had a choice to either refuse

16   or accept.

17   Q    What's that mean?

18   A    That means that someone has called our company and

19   requested a block be put on it so they annot be called.

20   Q    Okay.   So as of at least August the 14th -- at least as

21   of August the 13th at 2:41 in the afternoon, 2613 number is

22   blocked; true?

23   A    Yes.

24   Q    And it takes a bit of doing to undo a block; correct?

25   A    They have to call in and get it unblocked.   There's

199

1    Tonya Johnson Hyles obviously, but this is a conspiracy case,

2    and the connection between Mr. Hyles, the defendant's husband,

3    and Mr. Cannon who ultimately killed Coy Smith obviously is

4    important to this conspiracy.  The image on the front of

5    Government's Exhibits 28 and 29 are of Mr. Cannon and

6    Mr. Hyles posing together, which shows an association between

7    the two of them.  The writing on the back refers to the two

8    individuals.  It refers to two of the most wanted and boss

9    players.  It's referring apparently based on its placement

10   here to the images on the front.  I'm not offering this for

11   the truth of the matter asserted  I am not offering it for

12   the truth of Mr. Cannon and Mr. Hyles being two of the most

13   wanted.  I am not offering it for the truth of whether they

14   are boss players.  I am offering it just to establish the

15   relationship between these two individuals.

16            MR. HILL:  Judge, it's these bits of script that I

17   have the problem with.  I think at some point, we really do

18   have to run up against what the relevance of these things is.

19   I mean, I don't see how -- even if it is not offered for the

20   truth of the matter asserted, then why is it offered at all.

21   I don't understand what it is that has any bearing by these

22   statements as far as how it's going to say anything about my

23   client.  I don't see the relevance at all

24            THE COURT:  Well, as I understand it from what Mr.

25   Stevens just said, the purpose of tendering these two

227

1    A    Yes, sir.

2    Q    Okay.  And were you up there the wekend after the 10th?

3    That would have been the 11th or 12th

4    A    Yes, sir.

5    Q    Okay.  And how did you get the gunback from David

6    Carter?

7    A    Well, when I was on the corner, it was either that Friday

8    or Saturday, somebody came and told me hat Ninja was over

9    there flashing my gun around on Johnny B. Green's lot.  That's

10   where everybody was like hanging out at, and I waited for

11   awhile to try to catch him with it in his hand before I

12   approached him, and then I just decidedto go over there.  I

13   went over there and I asked him, I said, Hey, Ninja, you got

14   my gun, and he handed it over to me with no problem, and I

15   looked at the gun.  It was the same gun that I gave Tonya,

16   which was that stainless Beretta pistol grip.

17   Q    Okay.  So then after you got that gn from Carter, what

18   did you do with it ther?

19   A    I got into -- I walked back to my car  I got inside the

20   car and drove back down to my mother's house and put it in the

21   same place I had it at, in the breather cap.

22   Q    Now after that evening when you put that gun back in the

23   breather cap, did you ever have occasionto get that gun for

24   anyone else?

25   A    I didn't quite hear that.

VOLUME II

228

1    Q    Well, the following weekend, did you have -- did anybody

2    else approach you about that gun?

3    A    Oh, yes, sir.

4    Q    And who was that, tell the jury.

5    A    Amesheo Cannon.

6    Q    And that's D.D.?

7    A    Yes, sir.

8    Q    And where did he approach you at with the gun?

9    A    On the same corner, 12th and Adams, Johnny B.'s.

10   Q    And could you describe that night when Cannon approached

11   you about the gun, where you were at or where you had your car

12   parked in relation to Johnny B's

13   A    Well, I was really -- I wasn't on Johnny B. Green's lot.

14   I was sitting across from it where you an see everybody on

15   the lot just sitting on the lot

16   Q    And can you also see up and down Adams there from where

17   you were at?

18   A    You can see all four ways that way.

19   Q    Okay.  And is that where you were at when Amesheo Cannon

20   approached you?

21   A    Yes, sir.

22   Q    Did you see where Amesheo Cannon came from when he

23   approached you?

24   A    I seen him come from a tan which it was the same car she

25   was driving, the Pontiac, and he got out on the passenger